# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **NO. 1:06-CR-149** |
| | § | |
| **LOUIS LEON WALTERS** | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

This case is assigned to Hon. Thad Heartfield, Chief Judge.  Defendant's "Motion to Suppress," filed February 14, 2007, was referred to the undersigned for report and recommendation on August 8, 2007.  (Docket No. 56).  This report addresses that motion.

Defendant Louis Leon Walters' ("Walters") seeks to suppress evidence consisting of ingredients and materials used for manufacturing methamphetamine, small clear plastic baggies, a pistol, a surveillance camera, and methamphetamine obtained by police officers from his residence on April 11, 2005.  Defendant relies on the judicially-crafted "exclusionary rule" which prevents illegally seized items from being admitted into evidence during a criminal prosecution.  3 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 661 (2d ed. 1982).  When, as here, a defendant invokes that rule by moving to suppress evidence or statements

allegedly obtained illegally, the United States's burden is to prove that a warrantless search or seizure comports with the Fourth Amendment.  United States v. Roch, 5 F.3d 894, 897 (5th Cir. 1993).

An evidentiary hearing on the motion was held on September 18, 2007.  At that hearing, the court heard testimony from a police officer who first encountered Walters at his home, and from another officer who thereafter assisted in obtaining a search warrant and carrying out a search of the residence.  The court also heard and reviewed a video and audio recording of the events; received documentary exhibits; and heard testimony from the defendant.

## I. Issue for Decision

As originally filed, defendant's motion asserted several analytically distinct but interrelated grounds for suppressing the evidence.  After substitution of defense counsel, and by subsequent stipulation of the parties, the motion now hinges on a single point:  whether defendant's Fourth Amendment rights were violated during a "knock and talk" procedure at defendant's home.  That incident preceded a formal arrest on a warrant (the existence of which was unknown at the start of the "knock and talk") and a formal search performed later that day pursuant to a warrant based in part on information obtained during the encounter at the Walters residence.

Under the parties' stipulation, the United States agrees that *all* incriminating evidence obtained on April 11, 2005, must be suppressed under the "fruit of the poisonous tree" doctrine if the court determines that the "knock and talk" procedure violated defendant's Fourth Amendment rights.  Conversely, Walters agrees that *none* of the evidence should be suppressed if the "knock and talk" did not violate his constitutional rights.[1]

## II.  FACTUAL BACKGROUND

At approximately 4:20 p.m. on April 11, 2005, Officer Kevin Cooke, a Cleveland Police Department patrolman, received a tip that a named individual, Louis Walters, was cooking methamphetamine in the kitchen of his mobile-home residence on North Holley Avenue in Cleveland, Texas.  That tip came by telephone from a 17-year-old male, John Frazer, who stated that he personally observed methamphetamine being manufactured by Walters earlier that day.  He further stated that at least two pistols were on the premises, and that Walters had surveillance cameras in place at the mobile-home residence.

Officer Cooke, a sixteen-year law enforcement veteran with training regarding the cooking of the methamphetamine, decided to act on the spur of the moment.  He

---

[1]       Both sides also agree that certain post-arrest, custodial statements made in response to police questioning without benefit of <u>Miranda</u> advice and warnings should be suppressed.

contacted three other municipal police officers to accompany him to the residence for

officer-safety reasons.  They went immediately to a trailer park located at 411 North

Holley Avenue, Cleveland, Texas, where the Walters mobile home was parked.

When they arrived, Officer Cooke pulled into the driveway and parked his car on the

right side of the driveway entrance, approximately fifty feet from the front porch.

His car was situated so that the video recording device in the vehicle was focused on

the front entrance to the mobile home.  Officer Cooke wore a transmitting micro-

phone so that the audio portion of his encounter with the defendant also was

recorded.

        The other officers, James Primeaux, Paul Lowrey, and Malcolm Wiley, parked

their cars behind Officer Cooke.  The evidence is disputed as to whether their vehicles

completely blocked normal ingress and egress to the trailer park.[2]  However, police

vehicles were not positioned so as to surround the house.

---

[2]      Officer Cooke testified that he parked "beside the driveway" and
pointed at the residence so that his on-board camera would be able to record the
encounter.  Tr. at 14, 21.  He said that the other officers parked their vehicles
behind him so that the driveway was not blocked.  Id. at 14-15.  The video
recording from Officer Cooke's patrol unit confirmed that when Officer Cooke
drove into the driveway, he parked on the right side, facing the residence.  The
other police cars were not in sight when Officer Cooke drove up to the residence.
Walters, however, testified that the patrol cars were surrounding his house,
blocking the driveway and the street.  Tr. 121.  He also stated that Officer
Cooke parked on his front yard, not in his driveway, about 15-20 feet from his
home.  Id. at 125.

"No trespassing" signs may or may not have been posted.[3]  In any event,

Officer Cooke proceeded to an open-air front porch and knocked on the mobile home

front door at 4:30:30 p.m. (according to the time log on the video recording device in

Officer Cooke's patrol car).[4]  The other officers remained back, away from the front

porch a considerable distance.

When Officer Cooke knocked, no one immediately opened the door.  How-

ever, someone inside asked:  "Who is it?"  Officer Cooke responded that he was the

"police department."  He then heard a loud noise from inside, which sounded like

people were running throughout the mobile home.  He described the sounds as

indicating "excitement, like a panic reaction, just running through the house."  Tr. at

24.

After a few seconds, Walters opened the front door, came out onto the porch,

and closed the door behind him.  Officer Cooke testified that as soon as the door

opened, he smelled an "overwhelming chemical odor" emanating from inside the

---

[3]      Walters testified that the signs were posted on trees in his yard and
next to his door. Tr. at 125-26.  Officer Cooke and Officer Scott Felts testified
that no signs existed in either location at the time. Tr. 21-22, 94-95.  No signs
were visible in the video recording of the residence or in photographs taken when
the search was conducted on Walters' residence.  Gov't. Ex. 9-A; Gov't. Ex. 2.

[4]      Officer Cooke testified that he went to Walters' residence at
approximate 4:46 p.m.; however, the time log on the video retrieved from his
patrol car states that he arrived at Walters' residence as approximately 4:30
p.m.  The times used in this Report and Recommendation are based on time log on
the video, Exhibit 9-A.

mobile home.  Based on his training and experience, he associated that chemical odor with a possible meth lab.

Officer Cooke first asked the defendant his name, and the defendant gave his name incorrectly as "Walter Louis."  Officer Cooke and Walters then recognized one another from a recent incident at a Brookshire Bros. grocery store wherein Walters was arrested by Officer Primeaux for attempted theft.  During that incident, Officer Cooke was an assisting officer, and had found Walters hiding under a vacant house across the street from the Brookshire Bros. store.  Officer Cooke asked if Walters got his glasses back from the police department, and Walters replied that he had not.

Officer Cooke then requested identification.  As Walters began to explain that he did not have his identification because the police still had it from the Brookshire Bros. incident, two adult persons, a male and female, came from within the mobile home out through the front door and onto the front porch where Officer Cooke and Walters were standing.  When they opened the door he again smelled a very strong chemical odor coming from the residence.

The couple told Walters they were leaving, and continued off the porch. Without interdiction or interrogation from Office Cooke or the officers, they entered a vehicle parked near the trailer home, asked if they would be able to get out of the driveway, and Walters told them that the best way to get out was across his yard.

The video record of the incident shows their vehicle leaving the premises shortly thereafter.

Officer Cooke then informed Walters that he had received a report that methamphetamine was being manufactured in the mobile home.  He asked Walters if he was "dealing any methamphetamine" or if he was "cooking methamphetamine." Walters denied both questions.  Officer Cooke asked again whether Walters had identification.  Walters replied that he went to the hospital the night of the Brookshire Bros. incident, and never got his identification back from the police department.

Officer Cooke inquired whether there was any reason why anyone would make a complaint about a methamphetamine lab at the mobile home.  Walters responded that three boys were mad at him because they borrowed money from him, and had not paid him back.  He knew that the boys had been saying "that" (implying Walters was involved with methamphetamine) but stated that he did not "have anything to do with that . . . at all."

Officer Cooke again asked if there were methamphetamine in the house, and repeated his earlier questions as to whether Walters had a "lab going" or whether he "cook[ed] methamphetamine."  Walters answered these questions "no," and to bolster that denial, stated that he "ha[s] kids."

Officer Cooke brought up the previous Brookshire Bros. incident again and asked how it turned out for Walters.  Walters replied that he fell down and hit his head, and woke up at the hospital.  He also then confirmed that his name was "Louis Walters," not "Walter Louis."  They again discussed the boys who allegedly were angry with Walters over their debt to him.  Walters volunteered that one of them lived on a nearby corner.

At this point, the defendant stated – curiously – that he was going to get his wallet with his identification inside the trailer.  Officer Cooke said, "ok, why don't you grab your wallet for me."  Walters started toward the trailer, but then stopped, and stuttered – as he had at the beginning of the conversation – that the police still had his driver's license from the Brookshire Bros. incident.

Officer Cooke then asked who lived in the trailer house with him.  Walters replied that his 15- year old daughter, Latina Walters, lived with him.  He also stated that she was inside.  Officer Cooke again asked if there were "methamphetamine in [the] house" and if Walters had a "lab going."  Walters again replied "no."

Officer Cooke then explained his duty to investigate complaints of criminal activity, and asked yet again if the defendant had a lab in the house, was cooking methamphetamine, or used drugs.  The defendant again replied "no," and explained (apparently responding to the question as to his use of drugs) that he was a diabetic.

Officer Cooke testified that Walters "appeared to be very nervous.  His hands were shaking, his voice was trembling, he was breathing heavily, stuttering.  He was unable to stand still, he was moving around a lot."  Tr. at 28-29.  Officer Cooke asked Walters if he had any weapons on him since Frazer had reported that he had firearms and it was important to know for officer safety.  He also observed that Walters had his hand in his pocket.  Walters denied having any weapons.  One of the accompanying officers interjected from the yard that Walters had scissors.  Walters confirmed that he did.  Officer Cooke asked if Walters had any "pistols in [his] pockets," and Walters again said that he did not.  Officer Cooke, having observed that the defendant kept his hand in one front pants pocket, and was acting very nervous, told Walters he was going to check him for pistols.  Walters immediately stepped backwards, whereupon Officer Cooke said, "Whoa. Hold on a second buddy," and asked defendant again if he had a weapon.  This time, Walters admitted that he did.  Officer Cooke then took a pistol from the defendant's pocket.

At this point, the entire encounter, including the initial small talk regarding the earlier incident at a Brookshire Bros. store and the interruption that occurred when the unidentified male and female occupants came from within the mobile home and left, consumed approximately 5 minutes according to the time log on Officer Cooke's patrol car video recorder.

Once the weapon was discovered, interaction between Walters, Officer Cooke and other officers became less congenial and more confrontational.  Within the next 4 minutes and 30 seconds, Walters was arrested, handcuffed and placed in a squad car.  During that brief amount of time, Walters was asked about prior arrests; was directed by officers to come off the porch; was told to stop walking; was asked twice if he had other weapons; was asked who else was in the house; and was asked twice again if there were illegal drugs in the house.  At one point, Walters tried to walk away, but was directed to stop.  Officer Cooke commented to Walters that he seemed really nervous, and asked if he had anything to be nervous about.

Finally Walters was asked for permission to search the residence.  He refused, and stated Cooke could not search without a warrant.  Officer Cooke then asked who else was in the house, and Walters said that his daughter was, and was sleeping. Officer Cooke asked where she was in the house, and Walters then replied that she might be taking a bath.

Officer Cooke then told Walters that he was not going to search, but was going to open the door and call for the daughter inside.  Walters again expressly stated that Officer Cooke would need a warrant before searching his house.  Walters walked away (out of the video camera's field of view), and when Officer Cooke told him to come back, Walters said that he needed something to lean on.  He stammered: "I'm a diabetic and you're tearing me up."

Officer Cooke instructed the other officers to watch Walters.  Officer Cooke walked up to the mobile home front door.  Instead of opening it, he knocked. Walters followed, and told Officer Cooke not to open the door unless he had a warrant.  Officer Cooke replied that he wanted defendant's daughter to come outside. Walters stated he didn't want his daughter to come outside.  Officer Cooke prevented Walters from moving closer to the door.

In response to Officer Cooke's knock, someone from within opened the door. Walters said: "Go back in there Latina.  Go back in there."  However, instead of a minor female answering, another man, Rodney Cline (the second male occupant to appear at that point besides Walters), appeared.  Officer Cooke instructed the man to come outside; asked if he had any weapons; and asked his name, all while still holding the door open.  During this, Walters repeatedly told Officer Cooke or Mr. Cline to close the door.  Walters said, "there ain't nothing in there," and Officer Cooke, replied "yeah there is something in there."

Mr. Cline was patted down, and no weapon was discovered.  He did not have identification.  He was asked who else was in the house, and he replied, with prompting from Walters, that it was just him and defendant's daughter.

Meanwhile, Officer Cooke, still standing in the door which he held open, again yelled in "Hello, police department."  Walters repeated that Officer Cooke was not

allowed in his house.  This time, yet another male occupant of the house, John

Shaffer (the third other than defendant to this point) came to the door.  Officer

Cooke asked if he could talk with him and asked for identification.  During Officer

Cooke's conversation with this individual, Walters again asked for someone to close

the door.

Officer Cooke, still holding the door open, yelled in again, "Hello, police

department."  He then yelled "Latina."  After yelling into the house multiple times,

Officer Cooke instructed Walters to stop trying to close the door on him.  Walters

asked Officer Cooke to close the door, commenting that the air conditioning was on

and that his electric bill was going to be high.  Walters then admitted:  "She's not

there," and again instructed Officer Cooke to close the door.

During these brief proceedings, one accompanying officer walked away from

the scene shortly after Walters disclosed that he had prior misdemeanor arrests.  That

officer returned two minutes later, at 4:38:14 p.m., having ascertained that there was

an outstanding misdemeanor arrest warrant for Walters.  As Walters continued telling

Officer Cooke to close the door, the officer interjected at 4:39:40 p.m that defendant

wasn't going back in his house because he had a warrant for his arrest.  He made the

defendant walk down the porch stairs, handcuffed him, and put him in the squad car.

From the time the officers first arrived until defendant was arrested, a total of 9 minutes and 40 seconds had elapsed.  As mentioned earlier, some of that time involved discussion of an earlier incident immaterial to the present proceeding. Additional time was consumed by the extrinsic occurrence involving the two mobile home occupants who came out of the residence and drove away before Officer Cooke commenced his questioning of Walters.

### III.  "KNOCK AND TALK" – GENERALLY

Investigations have existed as long as there have been persons or agencies officially authorized to enforce criminal laws.  Investigations inherently and appropriately involve personal interviews with persons who may have knowledge of relevant facts, e.g., suspects and witnesses.  Thus, a police officer may approach an individual on the street without having any suspicion, request identification, and ask him if he minds answering a few questions.  Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Williams, 365 F.3d 399, 404 (5th Cir. 2004).  The fact that he is a police officer does not, alone, make the encounter a seizure.  Id. (citing United States v. Mendenhall, 446 U.S. 544, 555 (1980)).  The person in that situation has the choice to answer the officer's questions or to simply walk away.  Id. (citing United States v. Terry, 392 U.S. 1, 32-33 (1968)).

Similarly, such encounters may occur at personal residences.  Places of abode are where persons with helpful information most readily are found.  Visiting a citizen's residence in the course of an investigation is so in accord with what one would both expect and consider innocuous that the practice essentially flew under the legal radar until 1991 when a court first coined a catchy phrase, "knock and talk."[5] It described a police practice utilized when obtaining a search warrant is not feasible or desired.  An officer simply approaches and knocks on a private residence door, seeking information from the occupant but also hoping to eventually secure that person's voluntary consent to search the premises.

The "knock and talk" phrase caught on, and the practice, "packaged under a sporty new name,"[6]  became popular with law enforcement officers for an obvious reason:  Knock and talk consent searches save the time and trouble of securing a search warrant from a judge.  But the practice raised a red flag.  Criminal defense counsel perceived the procedure as being at odds with cardinal principles of Fourth Amendment law:  (1) "Physical entrance into the home of another without a warrant

---

[5]     "State v. Land, 806 P.2d 1156 (Or. App. 1991)is evidently the first appellate case to use the phrase 'knock and talk.'" H. Morley Swingle & Kevin M. Zoellner, "Knock & Talk" Consent Searches: If Called by a Panther, Don't Anther, 55 J. Mo. B. 25, 25 n.4 (1999).

[6]     Id. at 25.

is the chief evil the Fourth Amendment has sought to alleviate";[7] and (2) "searches and seizures inside a home without a warrant are presumptively unreasonable."[8]

The ensuing clash between this popular law enforcement technique and defendants' inherent distrust thereof has now generated much discussion in jurisprudence and legal commentary.  A current computer search indicates that the specific phrase "knock and talk" has been used in 91 federal appellate cases and 283 state appellate cases.  The Supreme Court of the United States has not yet addressed the emerging doctrine.  However, during its last term of court, the high court was invited to consider the issue in five separate cases wherein "knock and talk" evidence was at issue.  In each case,  the court declined to issue a writ of certiorari.[9]  Thus, for the time being, lower courts must continue to define the contours of the doctrine and delineate permissible police conduct with respect to "knock and talk" investigative procedures.

---

[7]     United States v. Miller, 933 F.Supp. 501, 504 (M.D.N.C. 1996) (citing Payton v. New York, 445 U.S. 573, 585 (1980)).

[8]     Id. (citing Payton, 445 U.S. at 586).

[9]     People v. Patterson, No. A111868, 2006 WL 3335126 (Ca. Ct. App. Nov. 17, 2006), cert. denied, 75 U.S.L.W. 3662 (2007) (appellate court affirmed district court denial of motion to suppress); Henderson v. Johnson, 203 Fed. Appx. 521 (4th Cir. 2006), cert. denied, 75 U.S.L.W 3646 (2007) (habeas petition regarding consent to search during "knock and talk"); Krause v. Kentucky, 206 S.W.3d 922 (Ky. 2006), cert. denied, 127 S.Ct. 2975 (2007) (Supreme Court of Kentucky found consent to search following "knock and talk" was coerced and therefore not voluntary); Robinson v. Virginia, 639 S.E.2d 217 (Va.), cert. denied, 127 S.Ct. 2442 (2007) (Supreme Court of Virginia affirmed conviction based on "knock and talk" evidence); Thomas v. United States, 430 F.3d 274 (6th Cir. 2005), cert. denied, 127 S.Ct. 87 (2006) (Sixth Circuit reversed district court's grant of motion to suppress "knock and talk" evidence).

American courts, generally, and the Fifth Circuit in particular, view pristine "knock and talk" incidents as legitimate investigative tactics.  U.S. v. Lewis, 476 F.3d 369 (5th Cir. 2007); U.S. v. Gould, 364 F.3d 578 (5th Cir. 2004); United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001).  American society deems that its citizens impliedly consent to unsolicited visits to their residences by members of the public such as Girl Scouts selling cookies, candidates for public office, pollsters, persons distributing religious literature and the like.  Accordingly, citizens have a "diminished expectation of privacy" in that area surrounding their homes which constitutes the main route taken by members of the general public when visiting.  See United States v. Titemore, 437 F.3d 251, 259 (2nd Cir. 2006).

Police officers with legitimate business may enter areas impliedly open to the public, and are permitted the same license to intrude as a reasonably respectful citizen.[10]  Thus, when an officer of the law simply walks up to the door and knocks, (s)he visits the house in the same lawful way that a private citizen would,[11] and the

---

[10]   See United States v. Moffitt, 233 Fed. Appx. 409, 411-412 (5th Cir. 2007), petition for cert. filed, (Sept. 14 & 16, 2007); Titemore, 437 F.3d at 259;  United States v. James, 40 F.3d 850, 861-62 (7th Cir. 1994); State v. Kriley, 976 S.W.2d 16, 22 (Mo. Ct. App. 1998); State v. Akers, 723 S.W.2d 9, 14-15 (Mo. Ct. App. 1986); State v. Graffius, 871 P.2d 1115, 1117 (Wash. Ct. App. 1994); State v. Green, 598 So. 2d 624, 626 (La. Ct. App. 1992); State v. Seagull, 632 P.2d 44, 47 (Wash. 1981) (en banc).

[11]   See, for example, Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964) stating:
    Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's
                                  (continued...)

ensuing "knock and talk" does not implicate the Fourth Amendment or its exceptions because no search or seizure occurs.[12]

A "knock and talk" is not wholly immune from the exclusionary rule, however, since it can occur under circumstances that constitute a search or seizure subject to Fourth Amendment protection.  For example, should an officer approach a home via a tactically-chosen route other than a walkway leading to the front or principal entrance, i.e., a route *different* than a typical visitor would choose, or should an officer enter an area clearly closed off to ordinary guests visiting the house, the officer likely will intrude on the dweller's reasonable expectation of privacy[13] and thereby conduct an unlawful search.  See Mancusi v. DeForte, 392 U.S. 364, 370-72 (1968).

---

[11](...continued)
'castle' with the honest intent of asking questions of the occupant thereof- whether the questioner be a pollster, a salesman, or an officer of the law.

[12]    See United States v. Thomas, 120 F.3d 564, 571 (5th Cir. 1997) (citing United States v. Dunn, 480 U.S. 294, 300-01 (1987)); Moffitt, 233 Fed. Appx. at 411-12 (applying Thomas and Dunn four-factor test used to determine if an area is curtilage); Thomas, 430 F.3d at 278-79 (holding that encounter was a legitimate "knock and talk" and did not rise to the level of constructive arrest).

[13]    To determine whether a person has a reasonable expectation of privacy, courts use the two-prong test: (1) "whether the individual has exhibited an actual (subjective) expectation of privacy"; and (2) "whether his expectation is one that society is prepared to recognize as 'reasonable.'" Katz v. United States, 389 U.S. 347, 361 (1967) (Justice Harlan concurring); Smith v. Maryland, 442 U.S. 735, 735 (1979); see also Dunn, 480 U.S. at 300 (citing Oliver v. United States, 466 U.S. 170, 180 (1984)) (listing factors relevant to determining whether a dweller reasonably may expect that an area outside the home is "curtilage" that a person reasonably might expect to be treated as the home itself.)

Similarly, should an officer conduct a "knock and talk" in a coercive manner, his conduct would constitute a seizure.  Coercive conduct on the part of the officer renders involuntary the dweller's apparent consent that ordinarily is implicit by opening the door and responding to officer questions.  Whether officer conduct is coercive depends on a fact-specific inquiry designed to determine whether the dweller reasonably felt that he was not free to leave or refuse to answer questions.  Florida v. Bostick, 501 U.S. 429, 439 (1991); United States v. Gomez-Moreno, 479 F.3d 350, 355-56 (5th Cir. 2007).  One court described an encounter that went beyond the bounds of a non-coercive "knock and talk" as a "constructive arrest."  United States v. Saari, 272 F.3d 804, 811 (6th Cir. 2001).

Finally, and of relevance here, "knock and talk" procedures, while primarily designed to secure voluntary consents to search, have added utility.  Even when an officer conducting a "knock and talk" procedure *fails* to secure the resident's voluntary consent to a search, the officer may nevertheless learn information that amounts to full probable cause sufficient to obtain a warrant.[14]  Moreover, no rule requires that an officer must thereafter end the encounter immediately.  United States v. Watson, 423 U.S. 411, 449 (1976) (Marshall, J. dissenting on other grounds); United States

---

[14]    United States v. Lewis, 476 F.3d 369, 381 (5th Cir. 2007); United States v. McGrath, 65 Fed. Appx. 508, 508 (5th Cir. 2003).

v. Ibarra-Sanchez, 199 F.3d 753, 759 (5th Cir. 1999).[15]  Rather, when a "knock and

talk" visit ripens into development of probable cause, the officer may even conduct a

warrantless search and seizure when exigent circumstances exist.[16]

Similarly, and even without evidence sufficient to establish either probable

cause or exigent circumstances, a police officer who has an *objectively reasonable*

*suspicion* that a person is involved in criminal activity may detain the individual

temporarily and question him to verify or dispel his suspicions.  Royer, 460 U.S. at

498; Terry, 392 U.S. at 28.  In so doing, he may conduct a "reasonable search for

weapons for the protection of the police officer, where he has reason to believe that

he is dealing with an armed and dangerous individual, regardless of whether he has

probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27.  The

scope of such search and seizure must be "'strictly tied to and justified by' the

circumstances which rendered its initiation permissible." Terry, 392 U.S. at 19

(citing Warden v. Hayden, 387 U.S. 294, 310 (1967) (Black, J., concurring)).

---

[15]     An officer may not, however, prolong his questioning or presence
solely to avoid the warrant requirement. United States v. Rodea, 102 F.3d 1401,
1409-10 (5th Cir. 1996).

[16]     See, e.g., Jones, 239 F.3d at 720-22 (plain view of gun during
reasonable "knock and talk" created exigent circumstances to make warrantless
entry into apartment and seize gun); United States v. Tobin, 923 F.2d 1506, 1512
(11th Cir. 1991) (along with the other evidence already known to the agents, when
they smelled marijuana during "knock and talk," "suspicions rose to the level of
probable cause," and exigent circumstances required a warrantless search).

During a <u>Terry</u>-sanctioned stop, an officer is not limited to the protective pat-down search if he believes the suspect poses a danger to himself or a potential victim. <u>Michigan v. Long</u>, 463 U.S. 1032, 1049-50 (1983).  For instance, during a <u>Terry</u> stop of an automobile, officers are permitted to conduct a search of the inside of the car to search for weapons when they have a reasonable belief (based on "specific and articulable facts") that the suspect is dangerous to himself or others.  <u>Id.</u>  Moreover, officers can make a protective sweep of a home in non-arrest situations if, while conducting a legitimate investigation, they believe that there are people present who pose a danger to themselves or a third party.  <u>United States v. Gould</u>, 364 F.3d at 584-87.[17]  That search must be cursory and limited in scope to dispel that suspicion of danger.  <u>Id.</u> at 593.[18]

Firearms are considered "'tools of trade' of those engaged in illegal drug activities," and their presence or potential presence factors prominently into an

---

[17]   There are two prerequisites for a protective sweep in a non-arrest situation: (1) "the police must not have entered (or remained in) the home illegally and their presence within it must be for a legitimate law enforcement purpose" and (2) the police must have "'reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to' those on the scene."  <u>Id.</u> at 587 (<u>citing</u> <u>Maryland v. Buie</u>, 494 U.S. 325, 337 (1990)).

[18]   Recognizing the inherent dangerousness of arresting someone at their home (on their "turf"), the Supreme Court has held that incident to an arrest, in addition to making sure the suspect is unable to gain control of a weapon, officers are permitted to conduct a limited protective sweep of the house if they have a reasonable suspicion that there are areas of the house "harboring other persons who are dangerous and who could unexpectedly launch an attack."  <u>Buie</u>, 494 U.S. at 333-34.  A protective sweep is not a full search and lasts as long as "necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  <u>Id.</u> at 335.  A protective sweep of the immediate surroundings of the arrest, including closets, are permitted without reasonable suspicion or probable cause.  <u>Id.</u> at 334.

exigent circumstance determination, especially in cases involving drug manufacturing or trafficking. United States v. Rhiger, 315 F.3d 1283, 1289-90 (10th Cir. 2003); United States v. Howard, 106 F.3d 70, 75 (5th Cir. 1997). Moreover, clandestine methamphetamine labs are intrinsically dangerous and potentially explosive due to their chemical ingredients. Thus, when people are present in the area of a methamphetamine lab, courts typically find that exigent circumstances exist. United States v. Atchley, 474 F.3d 840, 850-51 (6th Cir.), cert. denied, 127 S.Ct. 2447 (2007). Obviously, when people, firearms, and a clandestine methamphetamine lab are all present in the same surroundings, their combination makes exigent circumstances self-evident.

## IV. APPLICATION AND DISCUSSION

The "exclusionary rule" mentioned at the outset implements the Fourth Amendment's protections. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures*, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. (italics added). Obviously, there must be a "search" or a "seizure" before the Fourth Amendment is implicated. Terry, 392 U.S. at 16-18. As discussed in the preceding section, a chaste "knock and talk" procedure is neither

search nor seizure.  Consequently, the initial question the court must address is whether Officer Cooke's "knock and talk" crossed the legal threshold such that his actions constituted a search or seizure.

Officer Cooke's "knock and talk" investigation clearly became coercive and thereby escalated into a seizure *before* he learned of and executed the misdemeanor arrest warrant near the end of his encounter with Walters.  Similarly, Officer Cooke's conduct in forcibly holding open the door of the mobile home and looking inside constituted a warrantless search *before* he obtained a warrant.  There is room for vigorous debate as to the precise point in the approximately 10-minute encounter when Officer Cooke's conduct became coercive or intruded on the occupant's reasonable expectation of privacy.  However, for reasons discussed next, the court need not determine exactly when that occurred.

Clearly, there was no search at the *inception* of Officer Cooke's encounter with Walters.  He approached the mobile home at the front, principal entrance just as would a typical visitor.  He did not peek inside or otherwise make a surreptitious inspection revealing incriminating evidence.  If there were "no trespassing" signs posted at the entrance to the trailer park and on the exterior of the defendant's residence, neither he nor any of the other officers saw them.  Even if there were such signs, the Fourth Amendment does not "shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." Oliver,

466 U.S. at 182 n.13.  A home can be surrounded by a chain link fence with four "no trespassing" signs on it, but the front door area that visitors ordinarily use is *not* considered protected curtilage.  <u>Moffitt</u>, 233 Fed. Appx. at 411-12.  Notwithstanding barrier signs, police officers with legitimate business may enter areas surrounding the home impliedly open to the public and typical visitors.  <u>Id.</u>; <u>Titemore</u>, 437 F.3d at 259-60; <u>see also</u> 68 Am. Jur. 2d <u>Searches and Seizures</u> § 68 (2007).

Similarly, at inception, Officer Cooke's "knock and talk" was not a seizure.  He was patient when no one came to the door immediately.  Once Walters opened the door and stepped outside, Officer Cooke was polite and professional.  His tone of voice was respectful.  He made no unreasonable, offensive, or aggressive demands.  Neither he nor any of the accompanying officers barked out instructions or made intimidating gestures.  Rather, Officer Cooke was completely amiable, even expressing interest and concern for how the previous incident at the Brookshire Bros. store turned out with respect to Walters, and inquiring whether he had succeeded in retrieving his glasses.

The presence of three other officers and several squad cars at the scene constituted a greater show of force than if Officer Cooke had acted alone.  However, mere presence of multiple officers is insufficient to convert an otherwise consensual encounter to a custodial one, or to constitute constructive entry into the defendant's home.  <u>Thomas</u>, 430 F.3d at 280 (holding that five officers were not "inherently

coercive").  Moreover, the other officers' did not act coercively.  They remained a

respectful distance away from the porch; they did not unholster weapons; they did

not spread out to surround the dwelling or block all ingress and egress; they made no

demands; the time of day, although not "high noon," was during broad daylight and

within public view; and they used no physical force.  They gave no indication of being

additional participants, rather than passive observers.

      In short, neither Officer Cooke's nor the other officers' conduct at the outset

would represent to an objectively reasonable person that Walters or any other

occupant was under a constructive arrest or prevented from leaving or compelled to

converse with Officer Cooke.  Indeed, the video record of the incident shows just the

opposite.  Within seconds after Walters opened the front door (and quickly closed it

behind him), two other occupants exited the dwelling through the same door.  They

left in their vehicle without being asked to identify themselves, or questioned or

detained by Officer Cooke or any of the other officers.  Moreover, when Walters

initially announced that he was going to go back inside to get his wallet and identifi-

cation, Officer Cooke encouraged him to do so.

      At this threshold point, had Officer Cooke simply introduced himself, told

Walters that he was investigating possible criminal activity, unambiguously asked for

consent to search, and been invited by Walters to come inside and search, there can

be no legitimate debate over whether the entire encounter was without constitutional significance.  The "consent exception" to the Fourth Amendment's search warrant requirement would have been triggered, and the "exclusionary rule" would not apply. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

Of course, that is *not* what happened next.  But the hypothetical scenario posed in the preceding paragraph illustrates that *at the beginning*, nothing was amiss that would warrant application of the exclusionary rule.  There was no search or seizure, much less an unreasonable one.

At that same point – before any material circumstance changed – something of equal analytical significance happened:  *When Walters opened the door, Officer Cooke smelled a strong chemical odor consistent with manufacture of methamphetamine*.  From that moment forward, "knock and talk" principles no longer governed lawfulness of Officer Cooke's activities.  The strong odor of methamphetamine (corroborating the tip Officer Cooke received less than 20 minutes earlier) was sufficient not only to generate a reasonable suspicion of criminal activity, but also probable cause to believe that evidence of criminal activity was located on the premises.  "Distinctive odors, detected by those qualified to know them, may alone establish probable cause" to obtain a warrant.  United States v. McKeever, 906 F.2d 129, 132 (5th Cir. 1990) (citing Johnson v. United States, 333 U.S. 10, 13 (1948) (holding that federal

narcotic agents had probable cause to obtain a search warrant based on confidential informer and smell of burning opium)).  The Fifth Circuit has held that odors associated with the operation of a clandestine methamphetamine laboratory "might very well be found to be evidence of most persuasive character."  <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 28 F.3d 1388, 1392 (5th Cir. 1994).

Armed with reasonable suspicion or probable cause, Officer Cooke no longer was required to walk on eggshells to carefully insure that his conduct was not coercive or intrusive.  Rather, <u>Terry</u> and its progeny discussed above justified all of Officer Cooke's and the other officers' subsequent actions at the scene.[19]  Officer Cooke was not required to leave immediately or discontinue his investigation.  After detecting the odor associated with methamphetamine manufacture, he was entitled to detain Walters and engage in more persistent questioning to confirm or dispel his suspicions. Upon developing a reasonable suspicion that defendant had a gun in his pants pocket, he was justified in effecting a limited seizure in the form of a protective pat-down.  <u>Terry</u>, 392 U.S. at 27.  Officer Cooke had more than a hunch that defendant had a pistol on him.  He made specific reasonable inferences from the facts in light of his experience.  <u>Id.</u>  The tipster, John Frazer, said that defendant possessed multiple

---

[19]    As noted earlier, the United States acknowledges that custodial statements obtained from Walters during post-arrest interrogation and before administering <u>Miranda</u> warnings must be suppressed.  <u>See</u> note 1, supra.

firearms; Walters was acting nervous and kept putting his hand into his front right pants pocket.

After finding the gun and questioning Walters further, Officer Cooke knocked on the door, stating that he wanted Walters's daughter to come outside.  Officer Cooke had confirmed Frazer's tip in that he saw a surveillance camera, he smelled chemicals associated with a methamphetamine lab, and he seized one weapon.  Tr. at 24-29.  Walters initially lied about his name, lied about how many people were inside the house, lied about having a gun, and was acting very nervous.

With this information in hand, Officer Cooke could reasonably fear for the safety of himself and the three other officers.  He also could fear for the safety of a 15-year-old minor who, according to Walters and another occupant, was inside the house, potentially with other unknown adults, an explosive methamphetamine lab, and another pistol.  Once two more male adults came out of the house (in contradiction to Walters' assertion that his daughter was the only other person in the house), Officer Cooke's yelling into the house, knocking on the door and attempting to get the daughter out of the house was justified under the circumstances.

Once defendant's weapon was discovered, Officer Cooke was entitled to actually enter the premises, conduct a limited protective sweep, and secure the scene before applying for a search warrant for a more extensive search.  United States v.

Mendoza-Burciaga, 981 F.2d 192, 196 (5th Cir. 1992) (citing United States v. Johnson, 862 F.2d 1135, 1138 (5th Cir. 1988)).  Officer Cooke testified that when he originally knocked on the door, he heard people running around inside; he also observed a surveillance camera; and he believed defendant was lying about the number of people in the house.  However, Officer Cooke himself never opened the door to the mobile home.  It was opened three times during the encounter, always by occupants from within.  Officer Cooke simply held the door open after the next-to-last occupant came out while attempting to identify and evacuate all occupants.

Although he might have entered, Officer Cooke never, in fact, entered the house after concluding that all occupants were out.  He saw methamphetamine paraphernalia inside the house while he held the door open.  However, even if that were an unreasonable visual search, it is inconsequential because the same evidence was obtained later that evening when a lawful search warrant was executed.  The probable cause affidavit on which the warrant was based did not mention or otherwise rely on Officer Cooke's visual observations of items inside the mobile home.[20]

---

[20]     Instead, probable cause was based on information from two witnesses (John Frazer, the original tipster, and John Shaffer, one of the occupants who came out during the original investigation at the dwelling), defendant's nervous behavior, and the "strong chemical odor" coming from the house.

## V. Recommendation

The United States has carried its burden of showing that no incriminating evidence at issue resulted from an unlawful "knock and talk" constituting an unreasonable search or seizure.  Therefore, under the parties' stipulation, the defendant's motion to suppress evidence should be denied.

## VI. Objections

Objections must be: (1) specific, (2) in writing, and (3) served and filed within ten days after being served with a copy of this report.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b), and 72(b).

A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge of proposed findings and recommendations, see Rodriguez v. Bowen, 857 F.2d 275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of unobjected-to factual findings and legal conclusions accepted by the district court.  See Douglas v. United Servs. Auto. Ass'n., 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

SIGNED this   10   day of October, 2007.

_Earl S. Hines_

_____
Earl S. Hines
United States Magistrate Judge